UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GORDON MAYNARD and DAVID
MAYNARD,

      Plaintiffs,

v.                                  CASE NO: 8:07-cv-1149-T-23MSS

MERRILL LYNCH & CO., INC.,
as successor in interest to ADVEST, INC.,
and as Plan Administrator of the
ADVEST, INC., NONQUALIFIED DEFINED
BENEFIT PLAN,

      Defendant.

_____/

## **ORDER**

Pursuant to Section 502(a) of the Employee Retirement Income Security Act of

1974 ("ERISA") (codified at 29 U.S.C. § 1132(a)),[1] the plaintiffs Gordon Maynard

("Gordon") and David Maynard ("David") sue Merrill Lynch & Co., Inc., ("Merrill" or the

"defendant") as successor-in-interest to Advest, Inc., ("Advest") and as plan administrator

of the Advest Non-qualified Defined Benefit Plan.  Merrill moves for summary judgment

(Doc. 24), the plaintiffs respond (Doc. 28) in opposition, and Merrill (Doc. 35) replies.

---

[1] Section 502(a) provides that "a participant or beneficiary" of an ERISA Plan may bring a civil
action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of
the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).
Gordon Maynard withdrew (Doc. 12 at 2) count two of the complaint (seeking preliminary injunctive relief
under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), on behalf of Gordon Maynard).

## BACKGROUND

Gordon Maynard was employed by Advest, a securities brokerage firm, from July, 1987, to March, 2005, as a financial advisor (also known within Advest as an Account Executive).[2]  David, Gordon's son, was employed by Advest from August, 1989, until March, 2005, first as an Account Executive Assistant and later as an Account Executive.[3] On September 14, 2005, Merrill through a wholly owned subsidiary entered into a stock purchase agreement pursuant to which Merrill would acquire from AXA Financial, Inc.,[4] the outstanding stock of The Advest Group, Inc., which owned Advest.[5]  On December 2, 2005, Merrill closed the acquisition.[6]  Advest ceased to function as a distinct entity in March, 2006.[7]

### The Plan

From 1992 until the end of their employment with Advest, the plaintiffs participated in an "Account Executive Nonqualified Defined Benefit Plan" (the "Plan"), also known

---

[2]  April 24, 2008, Deposition of Gordon Earl Maynard [Doc. 25-2] ("G. Maynard Dep.") at 14, 21-22, 84, 103; G. Maynard Dep. Ex. 18 at ML00098 (Doc. 25-2 at 33); Ans. [Doc. 20] ¶ 2.

[3]  April 24, 2008, Deposition of David Charles Maynard ("D. Maynard Dep." [Doc. 25-3]) at 19-21, 29, 109, 123; D. Maynard Dep. Ex. 44 at ML00177 (Doc. 25-3 at 20); Ans. ¶ 48.

[4]  A February 5, 2007, letter of Glenn Dittes, a Merrill Lynch vice president, states that "AXA Financial Group acquired Advest in a stock deal from MONY in 2002."  G. Maynard Dep. Ex. 22 at ML00162-65 (Doc. 25-2 at 41-44); see also Ans. ¶ 4 (describing the mergers as a result of which The MONY Group, Inc., "which owned Advest Group, which in turn owned Advest," became a subsidiary of AXA.

[5]  Ans. ¶ 4; cf. June 12, 2008, Declaration of Glenn Dittes ("Dittes Decl." [Doc. 25-4]) ¶ 3; Dittes Decl. Ex. 3 at ML00054, ML00058, (Doc. 25-4 at 33, 58).

[6]  Ans. ¶ 4; Dittes Decl. ¶ 3.

[7]  Dittes Decl. ¶ 3; Ans. ¶¶ 3, 49.

within Advest as the "Exclusive Benefit Plan."[8]  The Plan document[9] states that Advest

established the Plan "for a select group of highly compensated account executives . . . to

ensure that the overall effectiveness of Advest's compensation program would attract,

retain and motivate qualified account executives."[10]  No party submits a copy of the

Plan's summary plan description.  However, a February 5, 2007, letter (the "February 5,

2007, Dittes letter"[11]) from Glenn Dittes, Merrill Lynch Vice-President of Human

Resources,[12] to Roberto Garay, Benefits Advisor at the Department of Labor's Employee

Benefits Security Administration ("EBSA"), describes the Plan, consistent with the Plan

document, as a

> deferred compensation plan based on a benefit formula that took into
> account the financial advisor's gross commissions earned, future
> commissions and certain productivity related measures, among other things.
> Under the terms of the plan, participants would accrue a benefit pursuant to
> the benefit formula over a ten year period that would generally be payable
> following the employee's retirement, or if earlier, following termination of
> employment.  However, following the initial ten year accrual period, a

---

[8]   G. Maynard Dep. at 29-30; D. Maynard Dep. at 29, 95; Ans. ¶¶ 6, 52.

[9]   See Dittes Decl. Ex. 1 at ML00017-23 (Doc. 25-4 at 9-15) (consisting of the Account Executive Nonqualified Defined Benefit Plan document as amended through January 1, 2000, with an attached amendment dated May 1, 2000) (the "Plan document"); Compl. Ex. A (Doc. 1-2) (same); Dittes Decl. Ex. 4 at ML00028-40 (Doc. 25-4 at 41-53) (consisting of the Plan document as amended through December 31, 2005) (the "Restated Plan"); Compl. Ex. B (Doc. 1-3) (same).

[10]   Dittes Decl. Ex. 1 at ML00017 (Doc. 25-4 at 9); cf. Dittes Decl. ¶ 4.

[11]   G. Maynard Dep. Ex. 20 at ML00157-65 (Doc. 25-2 at 36-44); Dittes Decl. Ex. 10 (Doc. 25-4 at 68-87) (including enclosures).

[12]   Although the letter is subscribed by Dittes as "Vice President–Leadership & Talent Management," Dittes states that he held that office between August, 2001, and December, 2004, and became Vice-President of Human Resources in January, 2005.  Dittes Decl. ¶ 2.  However, Dittes states that "my job responsibilities have been generally the same under both titles."  Dittes Decl. ¶ 2.

participant could begin to receive payments under the plan while he or she remained actively employed at Advest.[13]

The Plan limits eligibility for participation to account executives who meet a "Gross Commissions Threshold."  The threshold for fiscal year 1992 is $200,000, and the threshold increases each year.[14]  The threshold rises to $245,000 by fiscal year 2002 (after which no new participants may enter the Plan) and to $275,000 by fiscal year 2005.[15]  Plan participants accrue cash benefits based on their commissions above the threshold during their employment with Advest, and, "subject to certain conditions, a participant receives distributions of accrued benefits in equal monthly, quarterly, or annual payments over a ten-year period."[16] Following establishment of the Plan, both Gordon and David surpassed the applicable gross commissions threshold each year until they left Advest.[17]

---

[13]   G. Maynard Dep. Ex. 22 (Doc. 25-2 at 43) at ML00164; cf. Compl. Ex. C (Doc. 1-4) ("Account Executive Nonqualified Defined Benefit Plan Benefit Calculations as of September 30, 2005" for Gordon Maynard (stating that, "[u]nder the Plan . . . an 'Accrued Benefit' is calculated for each participant at the end of a qualifying period based on their production during that period.").

[14]   Dittes Decl. Ex. 1 at ML00017-18 (Doc. 25-4 at 9-10).

[15]   Dittes Decl. Ex. 1 at ML00017-18 (Doc. 25-4 at 9-10); cf. D. Maynard Dep. at 39, 41; D. Maynard Dep. at 53 ("It wasn't long after [the 2000 amendments to the Plan] that the plan was no longer open to new participants . . . .").

[16]   Compl. Ex. C (Doc. 1-4).

[17]   G. Maynard Dep. at 30; D. Maynard Dep. at 30, 58.

Article VI of the Plan provides that the Board of Directors[18] of the "Company" (defined to include both Advest and "any successor thereto by merger, consolidation, purchase or otherwise"[19]) shall appoint a committee (the "Committee") to administer the Plan.[20]  Additionally, Article VI states that the Committee "will administer and operate the plan in accordance with the terms of the Plan and will have all powers necessary to accomplish that purpose," including the power (a) to "construe [the] Plan"; (b) to "determine all questions arising in the administration of [the] Plan, including those relating to . . . the rights of Participants . . . to receive Benefits," with the Committee's "decision thereon [to be] final and binding upon all persons hereunder"; (c) to "authorize all disbursements of Benefits in accordance with the provisions of the Plan"; and (d) to "prescribe procedures to be followed by Participants . . . in claiming Benefits."[21]  Article VI further provides that "[t]he decision of the Committee in matters within its jurisdiction shall be final, binding, and conclusive upon the Company, Participants, Beneficiaries and any other person or party interested or concerned."[22]  Article VI further states that the Committee "shall act as agent for the Company in the administration of the Plan," and Article VI authorizes the Committee to appoint a delegate (even if not a member of the

---

[18]  The Plan defines the "Board of Directors" as "the Board of Directors of the Company, or the Executive Committee of such Board."  Dittes Decl. Ex. 1 at ML00017 (Doc. 25-4 at 9).

[19]  Dittes Decl. Ex. 1 at ML00017 (Doc. 25-4 at 9); see also Dittes Decl. Ex. 1 at ML00022 (Doc. 25-4 at 14) ("Any successor corporation to the Company, by merger, consolidation, purchase, or otherwise, shall be substituted hereunder for the Company.").

[20]  Dittes Decl. Ex. 1 at ML00021 (Doc. 25-4 at 13).

[21]  Dittes Decl. Ex. 1 at ML00021 (Doc. 25-4 at 13).

[22]  Dittes Decl. Ex. 1 at ML00022 (Doc. 25-4 at 14).

Committee) empowered to act with "the same force and effect for all purposes hereunder as if such action had been taken by the Committee."[23]

Between August 29, 2006, and February 9, 2007, the Committee consisted of Lou DiMaria, First Vice-President of Merrill Lynch Global Benefits and Chairman of the Committee; Frank Paparella, First Vice President, Merrill Lynch HR Relationship Manager; and Glenn Dittes, Merrill Lynch Vice-President of Human Resources.[24]  On February 9, 2007, Dittes resigned from the Committee,[25] and on February 20, 2007, Ken Politi, Merrill's Vice-President of Benefits (now Director of Benefits) was appointed to the Committee.[26]

Finally, the Plan includes a provision (the "non-alienation provision") stating that

benefits payable under the Plan shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and shall to the extent permissible be exempt from garnishment, execution or levy of any kind, either voluntary or involuntary, including any such liability which is for alimony or other payments for the support of a spouse, former spouse or children of the Participant, or for any other relative of a Participant prior to actually being received by the person entitled to the benefit under the terms of the Plan; any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, garnish, execute or levy upon, or otherwise dispose of any right to benefits payable hereunder, shall be void.  The Company shall not in any manner be liable for, or subject to the debts, contracts, liabilities, engagements or torts of any person entitled to benefits hereunder.

Dittes Decl. Ex. 1 at ML00022 (Doc. 25-4 at 14).

---

[23]  Dittes Decl. Ex. 1 at ML00022 (Doc. 25-4 at 14).

[24]  Dittes Decl. ¶ 9.  Dittes Decl. Ex. 5 at ML00065 (Doc. 25-4 at 55).

[25]  Dittes Decl. ¶ 10; Dittes Decl. Ex. 6 at ML00067 (Doc. 25-4 at 58).

[26]  Dittes Decl. ¶ 10; Dittes Decl. Ex. 6 at ML00068 (Doc. 25-4 at 60).

The Original Retention Loans

In October, 2000, each plaintiff entered into a retention agreement with Advest in connection with Advest's acquisition by The MONY Group, Inc.[27]  Under the retention agreements, each plaintiff "received a loan repayable in five annual installments . . . and became entitled to receive fixed and (subject to performance) conditional bonuses over the same period."[28]  The February 5, 2007, Dittes letter states that under the retention agreement Gordon "was eligible for an annual bonus over a five year period and in connection with the bonus, [Gordon] entered into a loan arrangement with Advest under which he was essentially permitted to borrow against his expected bonus."[29]  Other record evidence confirms this description as to each plaintiff's retention agreement. Gordon states that his retention agreement provided for an annual loan payment that "was matched up with the bonuses of approximately the same dollar amount, so that in effect Advest would be providing me with the cash with which to make the payments on [the loan]."[30]  David states that (a) his retention agreement provided for bonuses and a loan and was designed so that "you'd receive the bonus . . . just before the [loan] payment was due,"[31] (b) the retention agreement "was signed with the assumption that

_____

[27]  G. Maynard Dep. at 59-60; D. Maynard Dep. at 70-71; see also G. Maynard Depo. Ex. 13 at ML00125-26 (Doc. 25-2 at 23-24); D. Maynard Dep. Ex. 36 at ML00191-92 (Doc. 25-3 at 16-17).

[28]  Dittes Decl. Ex. 10 at ML00127 (Doc. 25-4 at 72); Dittes Decl. Ex. 11 at ML00217 (Doc. 25-4 at 92); see also G. Maynard Dep. at 61.

[29]  G. Maynard Dep. Ex. 22 at ML00164 (Doc. 25-2 at 43).

[30]  G. Maynard Dep. at 64-65.

[31]  D. Maynard Dep. at 73.

- 7 -

the bonuses and the whole [retention agreement benefits] package that they outlined to us–that it would cover these [loan] payments,"[32] and (c) as a result of the agreement, "after you get the bonus, you turn around and just basically give the money back to Advest."[33]

    As part of their respective retention agreements, Gordon received a retention loan from Advest and signed a five-year promissory note for $419,146.08,[34] and David received a retention loan and signed a promissory note for $419,145.78.[35]  Each plaintiff read his retention loan promissory note (the "Retention Loan Note") before affixing his signature.[36]

    The Retention Loan Notes provide for annual payments of principal and interest beginning February 15, 2002, with successive payments due on February 15 of each of the next four years.[37]  Additionally, the Retention Loan Notes include a provision governing "Events of Default" (the "acceleration provision") providing that, if "the Maker's employment with Advest Group and its affiliates is terminated for any reason," "the outstanding principal balance of the Loan and accrued interest, if any, . . . shall

---

    [32]   D. Maynard Dep. at 74; see also D. Maynard Dep. at 76 ("This was a somewhat complex arrangement where you've got the bonuses designed, if you will, to pay–effectively to make these payments.").

    [33]   D. Maynard Dep. at 81.

    [34]   G. Maynard Dep. at 59-60; G. Maynard Depo. Ex. 13 at ML00125-26 (Doc. 25-2 at 23-24).

    [35]   D. Maynard Dep. at 72; D. Maynard Dep. Ex. 36 at ML00191-92 (Doc. 25-3 at 16-17).

    [36]   G. Maynard Dep. at 61; D. Maynard Dep. at 71-72; see also G. Maynard Dep. at 69.

    [37]   G. Maynard Dep. Ex. 13 ML00125 (Doc. 25-2 at 23); D. Maynard Dep. Ex. 36 at ML00191 (Doc. 25-3 at 16).

automatically become immediately due and payable."[38]   The Retention Loan Notes also include a provision (the "offset provision") providing, "The Maker hereby authorizes Advest to offset any amounts which may become due hereunder as principal or interest against any other amounts due to the Maker with respect to his employment by Advest or otherwise."[39]   Finally, the Retention Loan Notes provide that the notes "shall inure to the benefit of Advest and its successors and assigns."[40]

The Exchange Loans

In December, 2002, each plaintiff signed an amended retention agreement and a new promissory note refinancing the original note.   Apparently, Advest offered to amend the original retention agreements and to refinance the original loans after a decline in brokers' business appeared likely to prevent Advest account executives from earning the bonuses designed to fund the loan payments.[41]   Under the amended retention agreements, each plaintiff receives a loan repayable in six annual instalments and becomes entitled to receive annual fixed and (subject to performance) conditional bonuses over the same period, with the bonuses payable shortly before the annual loan

---

[38]  G. Maynard Dep. Ex. 13 ML00125 (Doc. 25-2 at 23); D. Maynard Dep. Ex. 36 at ML00191 (Doc. 25-3 at 16).

[39]  G. Maynard Dep. Ex. 13 ML00126 (Doc. 25-2 at 24); D. Maynard Dep. Ex. 36 at ML00192 (Doc. 25-3 at 17).

[40]  G. Maynard Dep. Ex. ML00126 (Doc. 25-2 at 24); D. Maynard Dep. Ex. 36 at ML00192 (Doc. 25-3 at 17).

[41]  See D. Maynard Dep. at 84; G. Maynard Dep. at 75-76.  Under the amended retention agreements, no loan payment is due in 2003 and no bonus is to be paid in 2003.  Dittes Decl. Ex. 10 at ML00127-28 (Doc. 25-4 at 73); Dittes Decl. Ex. 11 at ML00217-18 (Doc. 25-4 at 92-93).

- 9 -

repayment became due.[42]  That is, the amended retention agreement provided for

bonuses with "an annual payment date which essentially allowed [each plaintiff] to make

his annual payment of principal and interest [on the refinanced loan] out of his after-tax

bonus amount."[43]  Under the amended retention agreement, each plaintiff becomes

entitled to receive the conditional bonus if his "Production" (apparently defined in the

original agreement) during the immediately preceding year reaches a "Production

Threshold" defined in the agreement.[44]  Apparently, the "Production Threshold" was

reduced in the amended retention agreements to increase the likelihood that the plaintiffs

would reach the threshold despite the decrease in brokers' business.[45]  However, the

amended retention agreements (a) provide that, "[i]f your employment with Advest is

terminated for any reason, the then outstanding principal and accrued interest on your

loan will become due and payable immediately" and (b) state that "your obligation to pay

back the Exchange Loan is unconditional and does not depend on whether or not you

---

[42]  Dittes Decl. Ex. 10 at ML00127-30 (Doc. 25-4 at 72-75); Dittes Decl. Ex. 11 atML00217-20 (Doc. 25-4 at 92-95).

[43]  The "Production Threshold" is $221,799 for Gordon and $228,941 for David.  Dittes Decl. Ex. 10 at ML00128-29 (Doc. 25-4 at 73-74); Dittes Decl. Ex. 11 atML00218-19 (Doc. 25-4 at 93-94)

[44]  Dittes Decl. Ex. 10 at ML00128-29 (Doc. 25-4 at 73-74); Dittes Decl. Ex. 11 atML00218-19 (Doc. 25-4 at 93-94).

[45]   Under the amended retention agreements each plaintiff becomes entitled to receive the new conditional bonus if the plaintiff's "production" reaches a 'Production Threshold' equal to 65% of the plaintiff's "production for the 12 production months ending September 30, 2002," that is, $221,799 for Gordon and $228,941 for David.  Dittes Decl. Ex. 10 at ML00128-29 (Doc. 25-4 at 73-74); Dittes Decl. Ex. 11 atML00218-19 (Doc. 25-4 at 93-94); cf. G. Maynard Dep. at 76 (stating that John Anastasia explained to Gordon that "they needed to modify this so that they could get us the bonuses at a lower level and still–so we could then repay the loan with those bonuses.  So it was the intention behind this, is what I got from John, that the whole replacement promissory note and the new program was to make it so that those of us that were responsible for repaying the loan would get the bonuses so we could repay it.").  Gordon and David's  "production for the 12 production months ending September 30, 2002" was $341,229 and $352,216 respectively.

receive the bonuses" provided in the agreement.[46]   Gordon signed an amended retention

agreement and a new "Exchange Program Promissory Note" note (refinancing his

Retention Loan Note) for $371,977.27.[47]   David signed an amended retention agreement

and a new "Exchange Program Promissory Note" (refinancing his Retention Loan Note)

for $371,977.[48]   Each plaintiff read his 2002 Exchange Program Promissory Note before

affixing his signature.[49]

The Exchange Program Promissory Notes provide for annual payments of

principal and interest beginning February 15, 2004, with successive payments due on

February 15 of each of the next five years.[50]   Additionally, the Exchange Program Notes

include an acceleration provision identical to the acceleration provision in the Retention

Loan Notes[51] and an offset provision identical to the offset provision in the Retention

---

[46]   Dittes Decl. Ex. 10 at ML00128 (Doc. 25-4 at 73); Dittes Decl. Ex. 11 atML0018 (Doc. 25-4 at 93); see also Dittes Decl. Ex. 10 at ML00131 (Doc. 25-4 at 76) ("The obligations of the Maker to make the payments provided for in this Note shall be unconditional."); Dittes Decl. Ex. 11 at ML00221 (Doc. 25-4 at 96) (same).

[47]   G. Maynard Dep. at 73, 83; G. Maynard Depo. Ex. 13 at ML00131-32 (Doc. 25-2 at 25-26); Dittes Decl. Ex. 10 at ML00127-32 (Doc. 25-4 at 72-77).

[48]   D. Maynard Dep. at 83-85; D. Maynard Dep. Ex. 36 at ML00196-97 (Doc. 25-3 at 18-19); Dittes Decl. Ex. 11 at ML00217-22 (Doc. 25-4 at 92-98).

[49]   G. Maynard Dep. at 74, 82; D. Maynard Dep. at 85-86; see also D. Maynard Dep. at 105.

[50]   G. Maynard Dep. Ex. 16 at ML00131; D. Maynard Dep. Ex. 39 at ML00196.

[51]   G. Maynard Dep. Ex. 16 at ML00131; D. Maynard Dep. Ex. 39 at ML00196.

Loan Notes.[52]  Finally, the Exchange Program Promissory Notes provide that the notes

"shall inure to the benefit of Advest and its successors and assigns."[53]

On the day he signed the Exchange Program Promissory Note, Gordon discussed

the amended retention agreement and note with John Anastasia, an Advest regional

manager.[54]  Anastasia explained that Advest was offering to amend the original retention

agreement and Retention Loan Note because, owing to "the 2000 crash and especially

the '01 crash," Advest account executives "were not able to meet the level" (apparently,

the "production threshold" that triggered a conditional bonus under the original retention

agreement) and, as a result, "Advest was going to be requiring us to repay the loan but

we weren't going to get the bonuses."[55]  Additionally, during this discussion, Gordon

noted that, owing to his advanced age, he might not work for an additional five years.

Gordon asked what would happen if he "retire[d] before the loan would have been retired

with bonuses."[56]  In response, Anastasia assured Gordon that "there's no way they're

going to seek to collect on the loan if I retired as long as I didn't . . . go to work for

another firm, try to take clients away from Advest, or divulge confidential information."[57]

Gordon received the same assurance from Grant Kurtz, Advest's Chief Executive Officer

---

[52]  G. Maynard Dep. Ex. 16 at ML00132; D. Maynard Dep. Ex. 39 at ML00197.

[53]  G. Maynard Dep. Ex. 16 at ML00132; D. Maynard Dep. Ex. 39 at ML00197.

[54]  G. Maynard Dep. at 75.  Cf. D. Maynard Dep. at 38 ("Mr. Anastasia's title, he was either a regional manager or district manager for the state of Florida for Advest . . . .").

[55]  G. Maynard Dep. at 75-76.

[56]  G. Maynard Dep. at 77.

[57]  G. Maynard Dep. at 77; cf. 61-62.

(later, chairman of the Advest Board[58]).  Gordon asked Kurtz whether, if Gordon retired, "Advest would be expecting me to repay."[59]  Kurtz assured Gordon that the retention agreement was "set up in order to get the tax deferral and that there's no way that Advest would be going after me to recoup that money" unless Gordon violated certain conditions, e.g., by "going to work for another firm, trying to take clients away from Advest, [or] giving information to people that was confidential with Advest."[60]

Although each plaintiff submitted the February, 2004, payment on his Exchange Loan, neither plaintiff submitted the February, 2005, annual payment or any payment following his resignation from Advest.[61]

Gordon's Personal Loan

Gordon also received a loan from Advest to help finance a settlement in a lawsuit by Gordon's client, Dr. Narsingh Gupta, against both Advest and Gordon.[62]  A November 3, 2004, memorandum from Philip Wellman to Advest's accounting

---

[58]  G. Maynard Dep. at 149-150.

[59]  G. Maynard Dep. at 71.

[60]  G. Maynard Dep. at 71.  Gordon's testimony is ambiguous as to whether the conversation with Kurtz occurred in 2002 in connection with the amended retention agreement or in 2000 in connection with the original retention agreement (or whether Gordon had a substantively similar discussion with Kurtz on each occasion) remains unclear.  Compare G. Maynard Dep. at 62, 70-72 with G. Maynard Dep. 78-80, 127.

[61]  G. Maynard Dep. at 83, 140; G. Maynard Dep. Ex. 26 ¶¶ 8-9; D. Maynard Dep. at 99, 102-103, 122; D. Maynard Dep. Ex. 48 ¶¶ 8-9.

[62]  G. Maynard Dep. at 91; cf. 17-18.

department (the "Wellman memorandum"[63]) states that in connection with the Gupta lawsuit (a) "a settlement was reached under which Advest and Gordon Maynard would pay Dr. Gupta $150,000"; (b) "Advest has paid this amount"; (c) "Mr. Maynard has agreed to contribute $120,000 to that settlement, by way of a loan from Advest" and has executed an attached September 3, 2004, promissory note; and (d) Gordon both agreed to the deduction of the monthly loan payment from his salary, and (if the salary deduction proved insufficient to satisfy the monthly payment) "authorized Advest to offset any amounts due against payments he is receiving under the Exclusive Benefit Plan."[64]

However, Gordon denies that he agreed to pay Dr. Gupta or to settle the lawsuit.[65] Gordon admits that he received the Wellman memorandum and signed the $120,000 promissory note (the "2004 Advest Promissory Note"[66]) attached to the Wellman memorandum.[67]  However, Gordon insists that he signed the note, not because he had agreed to settle the Gupta lawsuit or to contribute to the settlement, but because the

---

[63]  G. Maynard Dep. Ex. 16 at ML00248 (Doc. 25-2 at 27); Dittes Decl. Ex. 10 at ML00133 (Doc. 25-4 at 78).

[64]  G. Maynard Dep. Ex. 16 at ML00248 (Doc. 25-2 at 27); Dittes Decl. Ex. 10 at ML00133 (Doc. 25-4 at 78).

[65]  See G. Maynard Dep. at 91.

[66]  G. Maynard Dep. Ex. 16 at ML00249-51 (Doc. 25-2 at 28-30); Dittes Decl. Ex. 10 at ML00134-36 (Doc. 25-4 at 79-81).

[67]  G. Maynard Dep. at 89, 98.  Although understanding his right to read the "2004 Advest Promissory Note" before signing it, Gordon Maynard did not exercise the right.

Advest office manager, Ed (or Earl[68]) VanLandingham, informed him that "I had to sign the note or I didn't work there anymore."[69]

Moreover, before signing the note, Gordon sent a memorandum to VanLandingham and Anastasia questioning the propriety of requiring Gordon to contribute to the settlement.[70]  Gordon states that Advest attorney Gary Saretsky advised Gordon that, because Advest's attorney in the Gupta lawsuit also represented Gordon, Advest could not require Gordon to contribute to a settlement unless Gordon agreed to the settlement.[71]  However, following the settlement with Gupta, Wellman informed Gordon that Advest wanted Gordon to contribute to the settlement,[72] and ultimately VanLandingham required Gordon to sign the 2004 Advest Promissory Note in order to keep his job.[73]

The 2004 Advest Promissory Note provides for monthly payment from February 1, 2005, until the loan is repaid.[74]  Additionally, the 2004 Advest Promissory Note includes an acceleration provision identical to the acceleration provision in the Retention Loan

---

[68]  See D. Maynard Dep. at 110.

[69]  G. Maynard Dep. at 91-92.

[70]  G. Maynard Dep. at 92, 104.

[71]  G. Maynard Dep. at 92-93.

[72]  G. Maynard Dep. at 94.

[73]  G. Maynard Dep. at 91-92, 95.

[74]  G. Maynard Dep. Ex. 17 at ML00249 (Doc. 25-2 at 28).

Notes and the Exchange Program Notes.[75]  The 2004 Advest Promissory Note further

includes an offset provision stating, "The Maker hereby authorizes Advest to offset any

amounts which may become due hereunder as principal or interest against any other

amounts due to the Maker with respect to his employment by Advest or otherwise,

including any deferred compensation or Exclusive Benefit Plan monies."[76]  Finally, the

2004 Advest Promissory Note provides that the note "shall inure to the benefit of Advest

and its successors and assigns."[77]  During the remainder of his employment, each

monthly payment was deducted from Gordon's monthly.[78]

The 2005 Offset Amendment

Although providing generally that the Board may amend the Plan, Article V of the

Plan states that

> no amendment shall be made without the written consent of a Participant if
> the effect of such amendment would reduce a Participant's benefit to the
> extent accrued as of the date of the amendment.  Nothing in the preceding
> sentence shall limit or restrict the Committee's right to amend the Plan so as
> to affect the manner, mode, form or timing of distributions hereunder.

Dittes Decl. Ex. 1 at ML00021 (Doc. 25-4 at 13); Dittes Decl. Ex. 4 at ML00032

(Doc. 25-4 at 45).

---

[75]  G. Maynard Dep. Ex. 17 at ML00249-50 (Doc. 25-2 at 28-29)

[76]  G. Maynard Dep. Ex. 17 at ML00250 (Doc. 25-2 at 29).

[77]  G. Maynard Dep. Ex. 17 at ML00250 (Doc. 25-2 at 29).

[78]  G. Maynard Dep. at 99, 141.

Dittes states that "the Executive Committee of Advest's Board of Directors passed a series of Plan amendments effective January 1, 2005."[79]  However, although purportedly effective as of January 1, 2005, the amendments evidently were not adopted until September 2, 2005.[80]  The amendments purport to add the following sentence to the Plan's non-alienation provision:

> Notwithstanding the foregoing, the Company may elect offset against a Participant's Benefit any amounts that are due to the Company with respect to the Participant's employment or otherwise, including, but not limited to, amounts due to the Company pursuant to the terms of any promissory note executed by the Participant.

Dittes Decl. Ex. 2 at ML00050 (Doc. 25-4 at 28); Dittes Decl. Ex. 4 at ML00036-37 (Doc. 25-4 at 49-50).

In connection with Merrill's acquisition of Advest, the Plan was amended effective October 31, 2005, to provide the final payment of accrued benefits to Plan participants on June 30, 2007.[81]  Upon acquiring Advest, Merrill assumed sponsorship of the Plan.[82]

The Plaintiffs' Resignation and this Lawsuit

Gordon began receiving payments of his accrued benefit under the Plan in monthly installments of $2,626 in November, 2002, and continued to receive the monthly

---

[79]  Dittes Decl. ¶ 6.

[80]  See Dittes Decl. Ex. 2 at ML00043 (Doc. 25-4 at 21-25) (September 2, 2005, "Consent of the Executive Committee of the Board of Directors of Advest, Inc.," resolving to adopt and approve "the First Amendment to the Restated and Amended Account Executive Nonqualified Defined Benefit Plan, effective as of January 1, 2005").

[81]  Dittes Decl. ¶ 7, Ex. 2 at ML00050, Ex. 4 at ML00037; see also Doc. 1-4.

[82]  Dittes Decl. ¶ 4.

payment during the remainder of his employment.[83]  In March, 2005, the plaintiffs

resigned.[84]  Under the terms of the Exchange Program Promissory Note and the 2004

Advest Promissory Note, the resignation was an "Event of Default" that rendered the

outstanding balance and interest "immediately due and payable."[85]  However, neither

plaintiff submitted any further payment on the Exchange Loans,[86] and Gordon submitted

no further payment on his Personal Loan.[87]

In March or April, 2005,[88] Al Fink, an Advest manager,[89] called Gordon several

times to arrange a payment schedule for the Personal Loan.  Fink "suggested that

maybe we could take [Gordon's] monthly [payment under the Plan] and mark that off

against the loan."[90]  Gordon objected on the basis of the Plan's non-alienation provision,

and Fink stated that he would consult Advest's legal department on the issue.  Although

hearing nothing further from Fink,[91] Gordon continue to receive a monthly payment under

---

[83]  G. Maynard Dep. Ex. 22 (Doc. 25-2 at 43) at ML00164; see also G. Maynard Dep. at 52, 87; cf. 49.

[84]  G. Maynard Dep. Ex. 44 at ML00177 (Doc. 25-3 at 20).

[85]  G. Maynard Dep. Ex. 16 at ML00131, Ex. 17 at ML00249-50; D. Maynard Dep. at Ex. 39 at ML00196.

[86]  G. Maynard Dep. at 86, 140, Ex. 26 ¶¶ 8-9; D. Maynard Dep. 102-103, Ex. 48 ¶¶ 8-9.

[87]  G. Maynard Dep. at 100, 140-41.

[88]  G. Maynard Dep. at 106-07.

[89]  G. Maynard Dep. at 45 ("[Fink] was a member of management at Advest.  I'm not sure of his exact title."); see also D. Maynard Dep. at 55.

[90]  G. Maynard Dep. at 105.

[91]  G. Maynard Dep. at 106.

the Plan until December, 2005.  Around December 3, 2005, after Gordon's monthly Plan payment initially appeared to have been deposited into Gordon's account, the payment was "pulled back" or canceled.[92]  After complaining about the cancellation, Gordon recalls that he received a monthly Plan payment in January, 2005,[93] but Gordon apparently received no further payment.

A November 30, 2006, letter (the "November, 2006, Dittes letter"[94] ) from Glenn Dittes (at that time Merril's Vice-President of Human Resources and a member of the Committee) informs Gordon that Merrill would offset Gordon's Plan benefits by the amount he owed the Company under the terms of his Exchange Loan and Personal Loan.[95]  Although advising Gordon to contact Dittes "[f]or information pertaining to your Exclusive Benefit Plan," the letter mentions no right of appeal or procedures for appealing the decision.

After receiving the November 30, 2006, Dittes letter, Gordon contacted the U.S. Department of Labor ("DOL") for assistance.[96]  A January 25, 2007, letter (the

---

[92]  G. Maynard Dep. at 10-108; cf. 155.

[93]  G. Maynard Dep. at 109, 155-56.

[94]  G. Maynard Dep. Ex. 20 at ML00152-53 (Doc. 25-2 at 34-35); Dittes Decl. Ex. 8 at ML00152-53 (Doc. 25-4 at 62-63).

[95]  G. Maynard Dep. at 114, Ex. 20 at ML00152-53; Dittes Decl. Ex. 8 at ML00152-53.

[96]  G. Maynard Dep. at 114-15.  Whether or not Gordon spoke with Dittes after receiving the November 30, 2006, letter is unclear.  At his deposition, Gordon first stated that he was unable to recall whether or not he spoke with Dittes.  G. Maynard Dep. at 114.  However, when asked whether he understood that he possessed a right to seek review of a benefits decision by the full committee, Gordon replied, "No.  In fact, as far as I–when I talked with Dittes, he just said, 'That's it,' you know, the end of it. So that's when I contacted the Department of Labor." G. Maynard Dep. at 115.

"January 25, 2007, Young letter"[97]) from EBSA Supervisory Benefits Advisor Patricia Young to Dittes (a) notes that, under ERISA Section 206(d)(1), a pension plan "shall provide that benefits provided under the plan may not be assigned or alienated," 29 U.S.C. § 1056(d)(1), or in other words, "an employer may not hold a plan participant's vested benefits as collateral to satisfy the repayment of employee financial obligations unrelated to the plan";[98] (b) asserts that under Section 206(d)(1), "Mr. Maynard's right to access his pension funds should in no way be affected by the existence of obligations he may have incurred independent of the plan" and that "Mr. Maynard's pension benefits must be reinstated retroactive to the date they were cancelled";[99] (c) recommends removal (as non-compliant with ERISA regulations) of the provision in the amended Plan allowing the Company to offset against a participant's benefit "any amounts that are due to the Company with respect to the Participant's employment";[100] and (d) refers Dittes's questions to Benefits Advisor Roberto Garay.[101]

    The February 5, 2007, Dittes letter, responds that (i) "Merrill Lynch's position is that the Exclusive Benefit Plan is a 'top hat' plan" under ERISA and as such "the plan is permitted to contain a provision offsetting plan benefits by other amounts owed by

---

[97]  Dittes Decl. Ex. 9 at ML00154-55 (Doc. 25-4 at 65-66).

[98]  Dittes Decl. Ex. 9 at ML00154 (Doc. 25-4 at 65) (emphasis in original).

[99]  Dittes Decl. Ex. 9 at ML00154-55 (Doc. 25-4 at 65-66).

[100]  Dittes Decl. Ex. 9 at ML00155 (Doc. 25-4 at 66).

[101]  Dittes Decl. Ex. 9 at ML00155 (Doc. 25-4 at 66).

[Gordon] to Advest,"[102] (ii) because the Plan contains an offset provision (citing the Plan's non-alienation provision as amended), Merrill may offset plan benefits by amounts due under Gordon's Exchange Loan and Personal Loan;[103] and (iii) "[t]his conclusion is bolstered by the fact that in each of the promissory notes executed by Mr. Maynard, Mr. Maynard has contractually agreed to a provision which gives his consent to the offset."[104]

Dittes received no response from EBSA to the February 5, 2007, Dittes letter.[105] At some time (apparently following the exchange of letters between Dittes and EBSA), Garay informed Gordon that (apparently because, as Garay believed, the Plan is a "top hat" plan) the DOL could not represent Gordon in the matter but advised Gordon to retain an attorney in the matter.[106]   Sometime in 2007, Gordon followed the advice,[107] and this lawsuit followed on July 2, 2007.

Some time during the summer or fall of 2005,[108] David called Advest's human resources department to complain about non-receipt of his quarterly Plan benefit

_____

[102]  Dittes Decl. Ex. 10 at ML00162 (Doc. 25-4 at 68); cf. Dittes Decl. Ex. 10 at ML00165 (Doc. 25-4 at 71).

[103]  Dittes Decl. Ex. 10 at ML00162, ML000165 (Doc. 25-4 at 68, 71).

[104]  Dittes Decl. Ex. 10 at ML00162 (Doc. 25-4 at 68); cf. Dittes Decl. Ex. 10 at ML00164 (Doc. 25-4 at 70) (quoting the offset provisions in the Exchange Loan Promissory Note and the 2004 Advest Promissory Note).

[105]  Dittes Decl. ¶ 14.

[106]  G. Maynard Dep. at 119.  Garay also forwarded a copy of the February 5, 2007, Dittes letter to Gordon.  G. Maynard Dep. at 120.

[107]  G. Maynard Dep. at 122-23.

[108]   The time is unclear.  Compare D. Maynard Dep. at 62, 69 (stating that the last statement David received was the July, 2005, or second quarter statement) with D. Maynard Dep. at 63 (stating that the conversation in which David was referred to Horowitz occurred "in the summer of '05").

- 21 -

statement.[109]  Although an Advest employee promised to investigate and correct any

error, another ninety days passed without receipt of the statement.[110]  When David called

again, the Advest employee directed him to David Horowitz, Advest's chief counsel.[111]

David states that, in a telephone conversation in the fall or winter of 2005,[112] Horowitz

refused to send David the Plan statements[113] and explained, "You owe us money and . . .

you're not getting anything on this plan until all this gets resolved."[114]  David understood

Horowitz to mean that "we're not paying you" until repayment of the debt.[115]  David

received no further Plan statement and no notification from Advest of the amendment of

the Plan to provide for a final payout of accrued benefits on June 30, 2007.[116]

Merrill failed to notify David that Merrill would offset David's Plan benefits by the

amount owed under David's Exchange Program Promissory Note "because Merrill's

records did not reflect that [David] remained eligible for Plan benefits."[117]  However,

"Merrill recently discovered that David remained eligible for Plan benefits through the

---

[109]   D. Maynard Dep. at 62-63.

[110]   D. Maynard Dep. at 63.

[111]   D. Maynard Dep. at 63-64; cf. 56, 68.

[112]   D. Maynard Dep. at 64-65.

[113]   D. Maynard Dep. at 65.

[114]   D. Maynard Dep. at 66.

[115]   D. Maynard Dep. at 68.

[116]   D. Maynard Dep. at 67, 69; see also Dittes Decl. ¶ 7, Ex. 11 at ML00215 n.2 (Doc. 25-4 at 90).

[117]   Dittes Decl. ¶ 17; see also Dittes Decl. ¶ 7, Ex. 11 at ML00215 n.2 (Doc. 25-4 at 90).

date of the Plan's final payout."[118]  An April 21, 2008, letter from Dittes (still Vice-

President of Human Resources but no longer a member of the Committee) (the "April 21,

2008, Dittes letter"[119]) informs David (through David's counsel) that David's gross (pre-

tax) benefit is $382,529 and that Merrill would offset the benefit by the amount David

owed the Company under the Exchange Program Promissory Note.  Additionally, the

April 21, 2008, Dittes letter contains a section entitled "Appeal Rights," which states that

David "may submit a written appeal of this determination within sixty days" of receipt of

the letter and describes the procedures for an appeal.[120]  Specifically, the letter

(a) advises David to submit evidence pertinent to his claim for benefits with no loan

offset, (b) informs David of his right to obtain pertinent documents; and (c) states that

after reviewing comments and documents pertinent to an appeal of "this initial claim

determination," the Committee will render a final decision within sixty days or (if special

circumstances exist and upon written notice) after an additional sixty days.[121]

Dittes states that neither Merrill nor the Committee received an appeal from David

in response to the April 21, 2008, letter.[122]  Additionally, Dittes states that, other than the

complaint in this action, "neither Merrill nor the Committee has received any claim from

---

[118]   Dittes Decl. ¶ 17; see also Dittes Decl. ¶ 7, Ex. 11 at ML00215 n.2 (Doc. 25-4 at 90) ("In preparing for the January 25, 2008 Court-mandated mediation . . . Merrill discovered that you remained eligible for Plan benefits through the date of the Plan's final payout.").

[119]   Dittes Decl. Ex. 11 at ML00214-35 (Doc. 25-4 at 89-111) (including attachments).

[120]   Dittes Decl. Ex. 11 at ML00215 (Doc. 25-4 at 90).

[121]   Dittes Decl. Ex. 11 at ML00215 (Doc. 25-4 at 90).

[122]   Dittes Decl. ¶ 19.

either Gordon Maynard or David Maynard (or anyone purporting to act on their behalf) asserting that Merrill's application of the Plan's offset provision in Section 4.2 of the Plan to their benefits, or the Plan's 2005 First Amendment adding the offset provision to Section 4.2 of the Plan, was a violation of the Plan's terms."[123]  However, the January 25, 2007, Young letter asserts on Gordon's behalf (and, at least indirectly, on behalf of other plan participants[124]) that the offset provision violates ERISA, and the letter directs Merrill to reinstate Gordon's benefits.  Finally, Dittes states that the Committee "has decided claims from Plan participants on other issues and is available to review and decide Plaintiffs' claims pursuant to Article VI of the Plan."[125]

## DISCUSSION

Summary judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The evidence and the available inferences are viewed most favorably to the non-moving party.  Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006) (internal citations and

---

[123]   Dittes Decl. ¶ 20.

[124]   The letter both (a) recommends removal (as non-compliant with ERISA regulations) of the provision in the amended Plan allowing the Company to offset against plan benefits a participant's unrelated debts and (b) requests "a list of all the plan's participants that may have been affected by the [provision] since the plan's inception, along with the payments that must be returned to these participants." Dittes Decl. Ex. 9 at ML00155 (Doc. 25-4 at 66).

[125]   Dittes Decl. ¶ 20; see also Daft v. Advest, Inc., No. 5:06-cv-1876 (N.D. Ohio Nov. 16, 2006) (order staying proceedings and remanding claim to the Committee at the request of the parties); cf. Daft, No. 5:06-cv-1876, slip op. at 15-16 (N.D. Ohio Nov. 13, 2007).

quotations omitted).  The movant bears the initial burden of establishing the absence of a

genuine issue of material fact.  Celotex, 477 U.S. at 323.  If the movant is successful, the

burden of production shifts to the non-moving party, who must offer "sufficient evidence

of every element that he or she must prove."  Rollins v. Techsouth, Inc., 833 F.2d 1525,

1528 (11th Cir. 1987).  The non-moving party may not rest on the pleadings but must use

affidavits, depositions, answers to interrogatories, or other admissible evidence to

demonstrate that a material issue remains. Fed. R. Civ. P. 56(e)(2).  A scintilla of

evidence supporting the non-moving party's position is insufficient: "there must be

evidence on which the jury could reasonably find for the [non-moving party]."  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Exhaustion

"'The law is clear in this circuit that plaintiffs in ERISA actions must exhaust

available administrative remedies before suing in federal court.'"  Bickley v. Caremark

RX, Inc., 461 F.3d 1325, 1328 (11th Cir. 2006) (quoting Counts v. Amer. Gen'l Life &

Acc. Ins. Co., 111 F.3d 105, 108 (11th Cir. 1997).  However, a district court may excuse

a failure to exhaust when "'resort to administrative remedies would be futile or the

remedy inadequate,' or where a claimant is denied 'meaningful access' to the

administrative review scheme in place."  Perrino v. S. Bell Tel. & Tel. Co., 209 F.3d 1309,

1315 (11th Cir. 2000) (citations omitted).

Additionally, a participant's claim is "deemed exhausted" if a plan fails to establish

or follow procedures that meet regulatory requirements.  Section 503 of ERISA provides

that, in accordance with regulations of the Secretary of Labor, every employee benefit plan shall

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  Moreover, 29 C.F.R. § 2560.503-1 (the "claims regulation") details required procedures for handling benefit claims.  The claims regulation, which broadly applies to ERISA-covered plans, including a "top hat" plan,[126] provides that "[e]very employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations" and states that "claims procedures for a plan will be deemed to be reasonable only if" the procedures satisfy requirements detailed in the regulation.  29 C.F.R. § 2560.503-1(b).  The claims regulation requires written or electronic explanation of adverse benefit determinations and a notice of claim denial that provides, among other things, "[a] description of the plan's review procedures and the time limits applicable to such procedures . . . ."  29 C.F.R. § 2560.503-1(g)(iv).  Additionally, the claims regulation

---

[126]   See 29 U.S.C. § 1133; see also Eastman Kodak Co. v. STWB, Inc., 452 F.3d 215, 217 (2d Cir. 2006) ("Top hat plans are exempt from many provisions of ERISA . . . but like qualified plans, they are subject . . . to the duty to have a claims procedure."); U.S. Dep't of Labor, Employee Benefits Security Administration, Frequently Asked Questions About the Claims Procedure Regulation, FAQ A-12, http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html (last visited Oct. 28, 2008) ("The [claims] regulation establishes requirements for all employee benefit plans that are covered under Part 5 of ERISA, which would include top hat plans.  Certain top hat plans are specifically excluded from parts of ERISA . . . but that exclusion does not apply to section 503, under which the regulation was promulgated.").

states that a participant's claim is "deemed exhausted" if a plan fails to provide the

required claims procedures.

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(l).  This provision "was plainly designed to give claimants faced

with inadequate claims procedures a fast track into court . . . ."  Eastman Kodak Co. v.

STWB, Inc., 452 F.3d 215, 222 (2d Cir. 2006).[127]  Further, "under the 'deemed

exhausted' provision . . . . an ERISA benefits claimant is not required to exhaust a claims

procedure that was adopted only after a suit to recover benefits has been brought."

Eastman Kodak Co., 452 F.3d at 223.

The plaintiffs contend that the Plan lacked procedures for appeal of an adverse

benefits determination and that Merrill failed to notify the plaintiffs of any procedures for

appeal before this lawsuit.  In response, Merrill points to no provision in the summary

plan description or the plan document specifying the plan's ERISA-compliant claims

procedures.  Instead, the defendant (a) notes that the plan document gives the

Committee final authority over claims determinations, (b) asserts that the Committee has

decided claims from plan participants on other, unspecified issues, and (c) relies on

---

[127]  See also Employee Retirement Income Security Act of 1974; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70246, 70256 (Nov. 21, 2000) ("Claimants should not be required to continue to pursue claims through an administrative process that does not comply with the law.  At a minimum, claimants denied access to the statutory administrative review process should be entitled to take that claim to a court under section 502(a) of the Act for a full and fair hearing on the merits of the claim.").

Perrino v. Southern Bell Telephone & Telegraph Co., 209 F.3d 1309 (11th Cir. 2000) to

argue that the absence of a formal claims procedure does not excuse the plaintiffs'

failure to seek review before the full Committee.

However, after Dittes (presumably acting on behalf of the Committee, of which he

was then a member) in the November 30, 2006, letter informed Gordon of Merrill's

intention to offset Gordon's Advest loans against his Plan benefits, Gordon was not

required to infer from the Plan document the availability of an unmentioned appellate

procedure that, so far as the record shows, was not in existence.  Additionally, although

stating that the Committee was authorized to "prescribe procedures to be followed by

Participants . . . in claiming Benefits,"[128] Article VI of the Plan (on which Merrill relies)

would not have informed Gordon whether the Committee had exercised that authority.

Given the absence of a formal claims procedure and the failure to notify the plaintiffs of a

procedure for review, any administrative remedy theoretically available is "deemed

exhausted."

Merrill's reliance on Perrino is misplaced.  Perrino required exhaustion despite a

plan's technical non-compliance with the then-current verison of the claims regulation

because (a) the pertinent agreement specified a grievance and arbitration procedure for

resolving a dispute as to eligibility for benefits, see Perrino, 209 F.3d at 1312, 1317, and

(b) the record contained no evidence that the Perrino appellants "lacked access to or

knowledge about the Agreement's grievance and arbitration procedure," Perrino, 209

---

[128] Dittes Decl. Ex. 1 at ML00021 (Doc. 25-4 at 13).

F.3d at 1317.  By contrast, the Plan document includes no grievance procedure and the

record contains no evidence that a formal procedure for appeal existed.

Finally, even if Gordon should have inferred from the Plan document the possibility

of an informal appeal of the adverse benefits decision, Gordon's conduct is equivalent to

such an appeal.  Besides orally objecting in early 2006 orally to an offset as inconsistent

with the Plan's non-alienation provision, Gordon (following receipt of the November 30,

2006, Dittes letter) requested assistance from the DOL in reversing the decision, and on

Gordon's behalf (and, at least indirectly, on behalf of other plan participants) the DOL

objected in writing to the offset and directed Merrill to reinstate Gordon's benefits.  In the

circumstances, Gordon satisfied his duty to "appeal" the adverse benefits decision before

suit.  As to David, Merrill's failure even to inform David that Merrill had effectively

terminated his accrued benefits and to provide a statement of benefits prevented David

from availing himself of any informal avenue of appeal.  Although purportedly an "initial

claim determination," the April 21, 2008, Dittes letter discloses for the first time a

procedure for appeal of a benefits denial effectively rendered long before this lawsuit

commenced.  Accordingly, any administrative remedy theoretically available is "deemed

exhausted."

"Top Hat" Plans

No party disputes that the Plan is an "employee pension benefit plan" covered by

ERISA.[129]  Additionally, the defendant contends that the Plan is a "top hat" plan.  A "top

_____

[129] See 29 U.S.C. § 1002(2)(A)(ii) (defining an employee pension benefit plan to include (with
exceptions not pertinent here) "any plan, fund, or program . . . established or maintained by an employer

(continued...)

hat" plan is an employee benefit plan "which is unfunded and is maintained by an

employer primarily for the purpose of providing deferred compensation for a select group

of management or highly compensated employees."  29 U.S.C. §§ 1051(2), 1081(a)(3),

1101(a)(1).  Ordinarily, determining whether a plan is maintained primarily for the

purpose of providing deferred compensation for a select group of management or highly

compensated employees requires "a fact-specific inquiry, analyzing quantitative and

qualitative factors in conjunction."  Demery v. Extebank Deferred Comp. Plan (B), 216

F.3d 283, 288 (2d Cir. 2000) (citing Duggan v. Hobbs, 99 F.3d 307, 312 (9th Cir.

1996)).[130]  One court has apparently concluded that the Plan is not a "top hat" plan.[131]

However, the plaintiffs do not contest the issue, and the uncontroverted record evidence

suffices to establish that the Plan is a "top hat" plan.

"Top hat plans are subject to ERISA, 29 U.S.C. § 1003(a), but . . . are excluded

from many individual ERISA provisions on the basic assumption that high-level

employees are in a 'strong bargaining position relative to their employers and thus do not

---

[129](...continued)
. . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .").

[130]  Quantitatively, a "top hat" plan "must cover relatively few employees." In re New Valley Corp., 89 F.3d 143, 148 (3d Cir. 1996).  Qualitatively, "the plan must cover only high level employees."  In re New Valley Corp., 89 F.3d at 148.  The "top hat" exemption is narrowly construed, see Kross v. W. Elec. Co., Inc., 701 F.2d 1238, 1242 (7th Cir. 1983), and the burden of establishing that a plan fits the exemption is on the party asserting that it is a "top hat" plan, Alexander v. Brigham and Women's Physicians Org., Inc., 467 F. Supp. 2d 136, 142 (D. Mass. 2006), aff'd, 513 F.3d 37, 41 (1st Cir. 2008), cert. denied,. __ S. Ct. __, No. 07-1347, 2008 WL 1843705 (Oct. 6, 2008).

[131]  See Daft v. Advest, Inc., No. 5:06-cv-1876, 2008 WL 190436 (N.D. Ohio Jan. 18, 2008); see also Daft, No. 5:06-cv-1876, slip op. at 17-22 (N.D. Ohio Nov. 13, 2007).  Daft is on appeal before the United States Court of Appeals for the Sixth Circuit.  See Daft, No. 5:06-cv-1876 (Doc. 50).

require the same substantive protections that are necessary for other employees.'"

Holloman v. Mail-Well Corp., 443 F.3d 832, 837 (11th Cir. 2006) (quoting Goldstein v.

Johnson & Johnson, 251 F.3d 433, 442 (3d Cir. 2001)).[132]  "Top hat" plans are exempt

from ERISA's participation and vesting provisions, 29 U.S.C. §§ 1051-1061, funding

provisions, 29 U.S.C. §§ 1081-1086, and fiduciary responsibility provisions, 29 U.S.C.

§§ 1101-1114.  See 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).  However, "top hat"

plans are subject to ERISA's reporting and disclosure provisions, 29 U.S.C.

§§ 1021-1031, and administration and enforcement provisions, 29 U.S.C. §§ 1131-45.

See Demery, 216 F.3d at 287.  But cf. 29 C.F.R. § 2520.104-23 (filing of a statement

describing the plan with the Department of Labor satisfies ERISA's reporting and

disclosure requirements for a "top hat" plan).

Retroactive "Top Hat" Plan Amendments

    Although exempt from ERISA's accrued benefit anti-cutback rule,[133] Cogan v.

Phoenix Life Ins. Co., 310 F.3d 238, 242 (1st Cir. 2002), a "top hat" plan may not be

unilaterally amended to impair rights vested under the terms of the plan.  "[B]reach of

contract principles, applied as a matter of federal common law, govern disputes arising

out of ['top hat'] plan documents," Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3rd

Cir. 1995), and "top hat plans should be interpreted in keeping with the principles that

govern unilateral contracts."  Kemmerer, 70 F.3d at 287; see also Carr v. First Nat'l

---

[132]  See also Dep't of Labor Office of Pension & Welfare Benefit Programs, Opinion 90-14A, 1990 WL 123933 (May 8, 1990).

[133]  See 29 U.S.C. § 1054(g)(1) (providing that, with two exceptions, "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan . . . .").

Bank, 816 F. Supp. 1476, 1492 (N.D. Cal. 1993).[134]  In short, a "top hat" plan "is a

unilateral contract which creates a vested right in those employees who accept the offer

it contains by continuing in employment for the requisite number of years."  Kemmerer,

70 F.3d at 287 (quoting Pratt v. Petroleum Prod. Mgmt. Employee Sav. Plan., 920 F.2d

651, 661 (10th Cir. 1990)); see also Carr, 816 F. Supp. at 1488.  "As a corollary,

'[s]ubsequent unilateral adoption of an amendment which is then used to defeat or

diminish the [employee's] fully vested rights under the governing plan document is . . .

ineffective.'"  Kemmerer, 70 F.3d at 287 (quoting Pratt, 920 F.2d at 661).

The Plan document expressly requires the written consent of a Plan participant to

an amendment that has the effect of reducing a participant's accrued benefits.  Merrill

argues that the 2005 Offset Amendment requires no written consent because the

amendment "had no effect on the value of Plaintiffs' benefits; it simply changed the form

of distribution."[135]  Merrill cites no authority for the proposition that subjecting an accrued

pension benefit to a participant's debts to the plan sponsor effects no reduction in the

value of the benefit, and the proposition contradicts common sense.

Merrill further argues that, even under the pre-amendment Plan, "Merrill could

offset Plaintiffs' outstanding loan amounts against their Plan benefits" because the pre-

---

[134]   But cf. Hooven v. v. Exxon Mobil Corp., 465 F.3d 566, 573 (3d Cir. 2006) (unilateral contract principles apply "only where 'the asserted unilateral contract is based on the explicit promises in the ERISA plan documents themselves'" (quoting Carr v. First Nat'l Bank, 816 F. Supp. 1476, 1492 (N.D. Cal. 1993)); Alday v. Container Corp. of Am., 906 F.2d 660, 665-66 (11th Cir. 1990) (rejecting claim that benefit plan created unilateral contract because plan documents unambiguously provided that employer could terminate or modify the plan).

[135]   Doc. 24 at 25 (emphasis in original).

amendment Plan "does not specifically forbid it."[136]  To support the argument, Merrill cites

Foley v. American Electric Power, 425 F. Supp. 2d 863 (S.D. Ohio 2006), and In re

Carlyle, 242 B.R. 881, 890 (Bankr. E.D. Va. 1999).  Carlyle notes that, although

contracting parties may preclude setoff by agreement, some decisions hold that a waiver

of the right to setoff may not be implied.  242 B.R. at 892.  Additionally, Carlyle finds that

"[f]ew decisions have suggested that non-alienation language as typically provided for in

an ERISA plan is sufficient to be considered as a contractual waiver of the right to setoff."

242 B.R. at 893.  Accordingly, Carlyle concludes that a provision stating that the right to

payment under a plan "shall not be assigned, transferred, pledged, encumbered or

subject to any form of attachment" expresses no clear intent to waive setoff.  Carlyle, 242

B.R. at 893.  "Rather, it appears to be language of a standardized nature found in all

ERISA plans to prevent the imposition of an immediate taxable event" upon a participant.

Carlyle, 242 B.R. at 893.  Carlyle finds "more problematic" the two last sentences in the

following provision in another plan.

> No right or interest of any Participant or Beneficiary of any Participant to any
> benefit payable under this Plan shall be assignable or transferable or subject
> to any legal lien or process including, without limitation, execution, levy,
> garnishment, attachment or pledge.  To the extent provided by law, no right
> or interest of any Participant or Beneficiary to or in any of the benefits
> payable under this Plan shall be liable for or subject to any obligation or
> liability of such Participant or Beneficiary.  No Participant or Beneficiary shall
> have any right to assign anticipatorily or otherwise transfer any future
> benefits to which the Participant may be entitled under the Plan.

Carlyle, 242 B.R. at 894 n.12.  However, Carlyle concludes that the language "appears

better read to be an amplification of the anti-alienation language of the first sentence of

---

[136]  Doc. 24 at 25.

[the provision] rather than a manifest expression of the parties of an intent to waive setoff."  Carlyle, 242 B.R. at 894.

Carlyle fails to compel the conclusion that Merrill was entitled to offset the plaintiffs' outstanding loan amounts against their Plan benefits.  First, a non-alienation provision is typically included in an ERISA plan not only to secure tax deferral but also to comply with ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1), which provision "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners . . . even if that decision prevents others from securing relief for the wrongs done them," Guidry v. Sheet Metal Workers Nat. Pension Fund, 493 U.S. 365, 376 (1990); see also Boggs v. Boggs, 520 U.S. 833, 851 (1997) ("The anti-alienation provision can 'be seen to bespeak a pension law protective policy of special intensity: Retirement funds shall remain inviolate until retirement.'") (quoting J. Langbein & B. Wolk, Pension and Employee Benefit Law 547 (2d ed.1995)).  Although the "top hat" plan at issue here is not subject to ERISA's anti-alienation provision, an inference from the Plan's inclusion of "language of a standardized nature found in all ERISA plans" should also account for the non-tax reason for including the language "in all ERISA plans."

Second, the non-alienation provision states that benefits payable under the Plan shall not be subject "in any manner" to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and shall "to the extent permissible be exempt from garnishment, execution or levy of any kind, either voluntary or involuntary" prior to actual receipt.  The non-alienation provision further declares that "any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, garnish, execute or levy upon,

or otherwise dispose of any right to benefits payable hereunder, shall be void."  In short, the non-alienation provision precludes assignment of Plan benefits before actual receipt and bars both voluntary and involuntary alienation to the extent legally permissible. Because, as <u>Carlyle</u> and <u>Foley</u> concede, federal common law permits a waiver of setoff, an non-alienation provision in a employee pension plan expressly designed for the maximum breadth permitted by the law should be construed to include a waiver of setoff. To the extent that the offset provisions in Gordon's Personal Note and the Exchange Program Promissory Notes purport to allow offset against Plan benefits, the provisions are "void" under the plain terms of the Plan.  Accordingly, the Committee or Merrill's decision to offset the plaintiffs' plan benefits violated the plain terms of the Plan.[137]

### CONCLUSION

The defendant's motion for summary judgment (Doc. 24) is **GRANTED IN PART AND DENIED IN PART** as follows.  To the extent that the complaint includes a claim for "a breach of fiduciary duty," <u>see</u> Compl. ¶ 16, the claim is **DISMISSED WITH PREJUDICE** because as a "top hat" plan the Plan is exempt from ERISA's fiduciary responsibility provisions.[138]  Otherwise, the motion is **DENIED**.  On or before **November 10, 2008**, the defendant shall file a written response of no more than twelve

---

[137]   Because the decision violates the plain terms of the Plan, the parties' dispute about the degree of deference, if any, the decision enjoys requires no discussion.  <u>See</u> Holloman v. Mail-Well Corp., 443 F.3d 832, 837 (11th. Cir. 2006) (noting the uncertainty as to the proper standard for reviewing decisions of a "top hat" plan administrator but declining to decide whether the district court should have applied a deferential standard of review or <u>de novo</u> review.  "Because all of the questions in this case turn on interpretation of what the plain terms of the plans permit and require, the results would be precisely the same under either standard of review.").

[138]   <u>See</u> 29 U.S.C. § 1101(a)(1); <u>see also</u> Holloman v. Mail-Well Corp., 443 F.3d 832, 842 (11th Cir. 2006).

pages stating what issues, if any, remain to be tried in this action, and showing cause why in light of this order judgment should not be entered in favor of the plaintiffs.  On or before **November 18, 2008**, the plaintiffs may respond in no more than ten pages.

ORDERED in Tampa, Florida, on October 28, 2008.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE